Thank you. Thank you. So Mr. McGill, you – so you're going to be just – there's nobody speaking against you, so you've got 10 minutes. There may be a lot of questions for you, so we'll see how that goes, but you may proceed. Thank you, Judge Sullivan, and may it please the Court, Matthew McGill, for the Aliganga plaintiffs who are each victims of the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam. When the Taliban toppled the Afghan government in 2021, it immediately assumed full operational control of D.A.B. It installed sanctioned terrorists as governors of the bank, it removed female employees at gunpoint, and it commanded male employees to grow beards. The Taliban set aside the laws governing D.A.B.'s operations and imposed Sharia-based banking practices in their place. But the government, in its letter, tells us that this is still a bank of Afghanistan, and so the question, if it is a bank of Afghanistan, is it covered by the Foreign Sovereign Immunity Act? And that may be, even if it is also an agent of the Taliban. That is, it may be an agent of both, and on that the government is not clear, but the government seems to say, in its letter here, that it remains a bank of Afghanistan, and therefore covered by the Foreign Sovereign Immunity Act. Yes, Judge Calabresi, you have correctly described the government's letter, and the district court erred in uncritically adopting that assertion. It is emphatically the province of the judiciary now, under the Foreign Sovereign Immunities Act, to make the immunity determinations. This is the district court's first major error, is that it deferred to the executive branch when the whole point of the Foreign Sovereign Immunities Act... My question really goes, and I'm very unsure, frankly, about these cases, because they're very difficult. What you have been saying is that the Taliban has all sorts of authority over this bank, and so that the bank may be an agent of the Taliban, but can it be an agent of both the Taliban and Afghanistan? And if it is an agent of both, does the Foreign Sovereign Immunities Act say that the Taliban is an agent of something else? Let me first clarify what our claim is, and then I want to address the Foreign Sovereign Immunity Act question. Our claim is that DAB is now an alter ego of the Taliban. It is dominated and controlled by the Taliban, and the district court credited our evidence that the Taliban dominates and controls DAB. Now, to address your Foreign Sovereign Immunities Act question, the key question here is whether DAB today, or at the time of the attachment, is an agency or instrumentality of a foreign state under Section 1603 of the Act. If you turn to Section 1603 of the Act, it defines an agency or instrumentality as one, either a corporate entity, a separate juridical entity in which the foreign state owns 50% or more of the shares, or two, an organ of the foreign state. DAB does not issue shares, so it can only be an agency or instrumentality of the state of Afghanistan if it is an organ of the state of Afghanistan. To address and answer that question, you turn to this Court's decision in Filler v. Hanvit Bank, which sets out five non-exclusive factors to determine whether an entity is an organ of a foreign state. Well, don't we have to first decide whether there's a foreign state here? I mean, Afghanistan, it's not clear to me that Afghanistan is a foreign state as defined in the restatement and as articulated in our case law. I think there's a strong argument to be made under Klinghoffer-Morgan Guarantee public international law that Afghanistan is not today a foreign state. But isn't the first question that we have to answer? If Afghanistan is not a foreign state, then clearly the Foreign Sovereign Immunities Act does not apply, right? I think that would be true, but I don't think you have to answer the questions in that order. Why wouldn't we? Why isn't that the simpler question? The criteria, among the criteria of a foreign state is that it has the attributes of statehood. Defined territory and population, well, that's easy. Self-governance and foreign relations, clearly that, I don't see how they meet that condition. I would add to that, Your Honor. Your Honor, I agree with that. Well, I can keep going. I agree. Well, I guess they're doing that okay, and enter into international agreements, which there's nothing there to enter international agreements. I am not going to fight you, Judge Sullivan, on that. Well, let me then, although I'm quite uncertain, but if we go that way, aren't we infringing on the power of a president to define what is a foreign state? Aren't we, as courts, stepping over a line into what only the government can do, which is tell us what is a foreign state? I might agree on all of these things, and yet have a problem if what is a foreign state is something that only the President of the United States can in his foreign policy decide. Your Honor, I would submit that the answer to your question is no. The executive has exclusive power over the recognition of governments. That is not the same as determining whether a government or a nation qualifies as a foreign state within the meaning of the Foreign Sovereign Immunities Act. So you're saying that issue of whether a government somewhere qualifies as a state for a Foreign Sovereign Immunities Act is an issue on which the courts can decide, and in that decision, where there are these facts, is it an issue of law? Is it an issue of fact? How much deference do we owe? Do we simply do what the presiding judge has done and look at qualifications A, B, C, and D and say, oh my God, they're not there. This is an issue of law. We can decide it, or is this more complicated? Under the Foreign Sovereign Immunities Act, it is the judiciary's obligation to make these determinations. That's what the Supreme Court said. We've got sole responsibility for deciding or interpreting the statute, right? That was your opinion for the court in Beerewalt, and it's also the Supreme Court's decision. That was a good one, sure. Can I just... One second. Ms. Beard, I don't think we've started the clock, so time is standing still here. Oh, wow. Sorry. So you'll have to start over then. That will give Judge Kibranus lots of time to step in on something which is a field he's written about for years. Judge Kibranus and I have a dialogue on the question of central bank immunity going back more than a decade. So Judge Sullivan, I want to turn back to your question. You certainly could resolve the Foreign Sovereign Immunities Act question here in the manner that you have set forth. I am going to suggest that there is an alternative route that doesn't raise any of the issues Judge Calabresi is concerned about, which is to simply apply the filler versus handbag factors here. The key factor here is to determine whether one is an entity, is an organ of a foreign state, the key question is whether the foreign state actively supervises the entity. And nobody suggests that the foreign state of Afghanistan, to the extent it exists at all, is exercising any supervision whatsoever over DAB today. Instead, the U.S. Special Inspector General for Afghan Reconstruction says DAB is Taliban run and Taliban controlled. The Treasury Department and the State Department agree that DAB cannot today exercise any central banking functions. So there is, and because it is controlled by the Taliban. But isn't the underlying issue really whether because of the things you say, this money is available to the victims of the Taliban, or whether despite that, this money is Afghanistan money and belongs in some sense to the people of Afghanistan, because that is still in some way the government recognizes is there. Isn't that ultimately the fact issue of who gets this money? So your honor, in a typical judgment enforcement type case, if I am the judgment creditor and I am seizing assets on the basis that this entity, the entity that has the assets is the alter ego of the judgment debtor, that is a well established basis for attachment and execution in the state of New York. If there is a third party that says, wants to intervene in the case and say, wait a minute, those assets belong to me, New York law allows for that. But that hasn't happened here. That hasn't happened here because the state of Afghanistan functionally does not exist today. It has been completely obliterated and replaced by the Taliban. The Taliban is what owns, operates and controls DAB today. That makes it, we would submit, an alter ego. But you didn't have, the district court didn't make that determination here. It cut it off by saying that the Foreign Sovereign Immunities Act barred our attachment. Clearly that's what the court did, but I mean basically you're saying that we should just be remanding and the district court should be exercising, should be applying New York law attachment law, right? Yes. There is no, our submission is that the FSIA immunity doesn't apply for multiple reasons and I'd like to hit each of them, but then the right result would be to reverse the order to, that fails to, that denies the motion to confirm our writ of attachment and then we can proceed to the execution phase at which point there could be further litigation about whether in fact the Taliban is the actual owner of these assets. Well I mean that's something that you'll have to establish below if you get to the New York law, right? Correct. Correct. At the execution phase. And Judge Perconi expressed some skepticism that you'd be able to do that. She did, I would acknowledge that, but she also credited all of our evidence that the Taliban dominates and controls DAB. So the two statements are somewhat in tension with one another and perhaps even contradictory. I want to hit each of the reasons why I think the Foreign Sovereign Immunities Act holding here is erroneous and I want to just start with the principle of party presentation which has very, very deep roots in this court and indeed in the Supreme Court. This is the unanswered question in Walters. It's the question held open in footnote 11 of Walters, is whether when the sovereign status of an entity is unclear or in doubt whether the court can raise the issue sua sponte. The Supreme Court answered that question in 1921 and held no. In Ex parte Muir, that was a case where it involved a British ship or a ship that was under the control of the British government and that was the allegation. You argue that they can't do it even when the Foreign Sovereign Immunity Act issue is clear and I thought on that there was precedent to the contrary. In Walters, this court held that where the foreign sovereign status is conceded or not in dispute, then the court can address it sua sponte. Why in the language of a Foreign Sovereign Immunity Act, which is what we are applying, should there be any difference whatever on sua sponte raising based on uncertainty? You say we're bound by 1921 case of the Supreme Court. I guess we're bound by the Supreme Court a long time ago. But apart from whether we're bound, we're bound. But what is there in that act that would lead to any distinction based on how certain or uncertain? Because as this court set out in Walters, the reason the court can address it sua sponte when it's undisputed is the language of the act itself. The language says shall be immune. But the question here is whether the Foreign Sovereign Immunities Act applies at all. If you don't walk in the front door of the Foreign Sovereign Immunities Act, you never get to that word shall and then there's no basis, no statutory basis for sua sponte raising of the defense. So the question is really, we would submit, the one you go back to ex parte muire, which says when it's in doubt, it's not within the range of judicial notice. The court before it acts decides the question of doubt as it did here by saying it does apply and therefore acts sua sponte. That is, if the question is, is the shall there, the court has decided it. Now, you say decided it wrong, but then you win anyway and so you don't need to get it. But once the court has decided that it does apply, although you and I might think it is in doubt, then the language of the act allows sua sponte. That is, I don't see how this argument adds anything to the argument you have made before. That is, if the argument before works, it works. I would submit, and I recognize my time is winding down, the reason I wanted to introduce the argument is that I actually think it's the narrowest basis on which the court could rule here. It's that nobody from Dab or the putative state of Afghanistan showed up to do not, it's not within the range of judicial notice to say that this is a sovereign entity. It is, it requires, this is the words of the Supreme Court, normal party presentation. The second point I wanted to make is that it's an independent basis for reversal that the district court's deference to the executive branch here. That is directly contrary to the Supreme Court's decision in Altman. The district court did not conduct an actual analysis of central bank immunity under the act. It did not conduct an analysis of whether the Dab is an organ. Well, I mean, you didn't get to even respond to it, or did you? We did not, Your Honor. It was the, the United States put in its letter and the decision was out about three hours later. Judge Cabranes, I can see you're Mr. McGill, let's go to that very question. You suggest that the executive wants you to have these funds. Is that a fair statement of your perspective here? I'm not saying that as to us individually, but I do believe the executive set aside three and a half billion dollars for claims of victims of terrorism. Let me put it another way. It strikes me that all that we know about the executive's position in this case is that the property is blocked. That's what we know for certain, right? We do know that. Do we know anything more than that? We know that the executive took a position that central bank immunity bars an attachment. We know that we can read the words of the executive order. We can read the words of the fact sheet that accompanies, accompanied the executive order. So, and on that point, it did say that it was reserving three and a half billion dollars for victims of terrorism in the fact sheet. That's appendix page 311, I believe. Right. But the executive seems to be of the view that it can take some or all of it as it sees fit, right? That is certainly the implication of what they have done thus far. So three and a half billion was put aside for humanitarian purposes, but none of it's been spent at this point, correct? That's correct, your honor. And I assume the executive could also say, if it wanted, we can take three and a half billion and basically do a receivership and pay off people who were victims of Taliban crimes. Could they do that? If the, I'm not certain that the IEPA would give the executive precisely that authority, but the executive clearly believes it has broad authority. IEPA gives them the authority to use it for humanitarian purposes directed at Afghanistan, but not to use the money for purposes of compensating victims of Taliban's crimes. So, your honor, I haven't fully analyzed that question, but the IEPA requires a national emergency and a declaration of national emergency and some threat to national security. So it could be argued that your compensation scheme that you're hypothesizing doesn't come within the statute. But the core point is that the executive branch here made a decision to take three and a half billion dollars of assets that supposedly belong to the Afghan Central Bank, and that could only be done because it actually was assets that were in the hands, that otherwise were going to be in the hands of the Taliban. That was the main rationale. But if we agreed with you, could the government still step in before anything else happened when we send it back to the district court to analyze other things and take the remainder of these funds for humanitarian purposes as they did the earlier ones? We would say no. If we have a writ of attachment on the assets, we would say that we have a lien. Well, if we find, you know, if the district court ultimately gave you a writ of attachment, but that would require some more steps in any event, wouldn't it? Deciding priority, deciding any number of things which are still an issue. What I'm puzzled is, here the government comes in and takes half the money that is there and says we want to use it for the people of Afghanistan. It then tells us that the rest of the money that is there is covered by the Foreign Sovereign Immunities Act, so you can't get at it. And then, is it able then to take that money and put it with the others? A dispassionate observer, Judge Calabresi, might conclude that the government is speaking out of both sides of its mouth. Assuming that the government has two mouths and not two heads. It's supposed to, there's supposed to be a unitary executive. That's the theory of Zivotofsky. So, the deference to the executive branch here that the district court showed is an independent basis for reversal. It's contrary to the Supreme Court's decision in Altman, and it's contrary to the very purpose of the enactment of the Foreign Sovereign Immunities Act. Right, but you're not asking us to send it back and say do it again, right? You're saying we can just do it ourselves. You should conclude that the Central Bank of Afghanistan, DAB, is not an organ of Afghanistan today, either because Afghanistan is not a foreign state at all, or at least because if Afghanistan remains a foreign state, it is not exercising any supervision over DAB today. That is absolutely undisputed under the current factual record. The final point I'd make is with respect to the district court's rather cursory conclusion that these funds were being used for central banking functions under the test of NML capital, and I would just cite to refute that the Joint Treasury and State Department statement from 2022, which says prior to, this is prior to the blocking, prior to the blocking, when the Taliban took over Kabul, Afghanistan's central bank, DAB, lost access to its accounts at financial institutions around the world because of the uncertainty regarding who could authorize transactions on DAB's accounts. DAB couldn't use the money for anything even before it was blocked as a result of the Taliban takeover. So I would submit that that alone would refute any suggestion of immunity under the central bank immunity. But I mean, in January of this year, you had the Special Inspector General for Afghanistan suggesting that the U.S. might actually return these funds to DAB, right? That is true. And on the condition or if it were the fact that DAB implemented adequate anti-money laundering and counter terrorist financing controls, like the sorts of things you would ask a central bank to do. That's correct. And so I guess what I'm asking is this, should we be remanding, if we go your route on this, should we be remanding so the district court can assess in light of recent developments whether or not this is a central bank? No, because the immunity is measured as of the date of the attachment. So we would have, we had our attachment writ was granted on an ex parte basis and then we filed a motion to confirm it under New York law. And that is the motion that Judge Caproni denied. And that is the order of which we seek to reverse. If you reverse that order, then our attachment motion would be confirmed. That should, that then would, we would then proceed to execution. And at the execution phase, we would still need to demonstrate at that time that the assets are Taliban assets. Under New York law. Under New York law. And our theory as to why they are Taliban assets is that they're an alter ego. DAB is an alter ego of the Taliban. Today.  Today. As of the time of attachment? As of the time of the attachment, it certainly was. It remains so today. But that has not been discussed below under New York law. It has, it was discussed. We haven't gotten to the execution phase. But the reason I raised the point is that Judge Caproni's opinion for the court and NML goes into some detail about the timing of when you do the immunity analysis. And in that case, it was, it's clear it's as of the date of the attachment. And so that's why I circled back to this point about the, what was the state of the funds even before the blocking? Because one of the amici has argued that we shouldn't be able to take advantage of the fact that the funds were, are blocked and can't be used for any purpose right now, merely because they're blocked. The amici is suggesting that, well, they, but for the blocking, maybe they would be used for central banking functions. And I'm saying that's clearly not true, because the second the Taliban took over, they lost signature authority over the account. They couldn't do anything with it. So at that point, those funds were not being used for any central banking functions. Central bank immunity can't apply. It also can't apply for the more basic reason that DAB is not an agency or instrumentality of a foreign state. What I'm asking is, are you asking us to make some decisions with respect to New York law of execution of attachments which were not really decided by the district court?  No, you need a remand for that. We need, we should vacate the decision holding that the assets are immune must be vacated. And remand to the district court for further discussion. At least that, I would submit that there was no argument. So here's why I think you could actually just order the district court to confirm the attachment. Absent foreign sovereign immunity, there's no argument on the other side. Well, the argument is that this is not the Taliban assets. No, no, there's no party on the other side. Well, at that moment there may be because it never came up that way. I'm just wondering whether we should be careful not to forestall arguments that may be made that haven't been made because the district court didn't really find it necessary to investigate. Well, I... Because once the district court says this is foreign sovereign immunity and you can't get at it, the district court didn't talk about anything else. That is correct, Judge. They did it in essentially 30 seconds when they got the government paper. That's... Assuming we agree with you, shouldn't we just say you're wrong about that? Now, go back and do all the other things that may be there, which we don't really fully know.  Judge Calabresi, I don't quarrel with that at all. I do think it would be important for the court to make the point that if the court concludes, this court concludes, that these are not sovereign assets, then the Taliban gets treated like any other litigant. And so it doesn't get any... The Taliban of all people should not get any special breaks. So if we would have to make a showing at the execution stage that these are assets that belong to the Taliban. Right, and that's one that Judge Caproni expressed some skepticism over, but you're confident you can persuade? Yes, we are. Okay. Judge Caproni, you had a question, I think. Yes, before you, I have a very simple question. And I want to give you an opportunity to retrace some of the steps that we've gone through here very successfully. What exactly is the decree that you seek from us? That is, after this interesting argument, what do you want us to do? What is the decree of the Second Circuit in this case? I would submit the decree should be the decision of denying the motion to confirm the attachment is reversed. And the case is remanded with direction that the court confirm the attachment. And that the case then can proceed to the execution phase. At which point in time, all of the New York law questions under execution law can be addressed. And the reason why I think it would be appropriate to simply confirm the attachment is that the entire point under New York law of a confirmation proceeding is to give the party opponent due process. To give them a chance to be heard. That happened here. We served the Taliban. We served DAB. They didn't come to court. They got the due process that New York law affords them. Nobody actually disputed that. The only thing standing in the way of the confirmation of the attachment was the Foreign Settlement Reunions Act. You're talking a lot. Judge Cabranes asked you a very specific, narrow question. What does our decree read like? And the first part of your answer was to that. You then went on. I am sure that our decree would never be as long-winded with respect as all the rest. Our decrees aren't that way. Sometimes your decrees are accompanied by explanation. You're saying reverse the district court with respect to its order that vacated the attachment, right? It denied our motion to confirm the attachment. And so then we would be remanding with instructions to go forward then on the execution part of this. Correct. We would have to proceed under New York law in that respect. Thank you. All right. Well, thank you, Mr. McGill. Thank you, Your Honor. I think in terms of time. But we had questions, so it's an interesting case. Thank you. Will we reserve decision?